## EDDY v AVON TOWNSHIP

## SHERMAN v AVON TOWNSHIP

Docket Nos. 66295, 66296. Decided December 23, 1982. On application by the defendant for leave to appeal the Supreme Court, in lieu of granting leave to appeal, reversed the judgment of the Court of Appeals and reinstated the judgment of Oakland Circuit Court. Rehearing denied 417 Mich 1129.

Hyacinth J. Eddy and Howard Sherman, owners of certain property in Avon Township, Oakland County, zoned single-family residential, brought an action against Avon Township challenging the zoning classification of the property. The Oakland Circuit Court, Steven N. Andrews, J., concluded that the plaintiffs had failed to show that the classification was unreasonable. The Court of Appeals, M. J. Kelly, P.J., and M. F. Cavanagh and Elliott, JJ., reversed in an unpublished opinion per curiam (Docket Nos. 78-5091, 78-5132). The defendant applies for leave to appeal.

In an opinion per curiam, signed by Chief Justice Fitzgerald and Justices Williams, Coleman, and Ryan, the Supreme Court *held:*

The trial judge viewed the property in question and heard testimony offered by expert witnesses supporting both sides of the issue. He responded to each factor detrimental to the classification and resolved the credibility of the witnesses in favor of the defendant. On the entire record, the Supreme Court does not conclude that it would have arrived at a different result had it been in the position of the trial judge. The Court of Appeals did not give the trial judge's findings the weight due to them.

The judgment of the Court of Appeals is reversed, and the judgment of Oakland Circuit Court is reinstated.

Justice Levin, joined by Justice Kavanagh, dissenting, would not reinstate the judgment of the trial court because it is apparent from the record that the expert on whose testimony the trial court relied was not testifying from his own knowledge or experience but rather on the basis of information which he obtained by communicating with others and by reference to books and other secondary sources. His testimony was not supported by specifics, but rather stated the percentages of the

selling price which the various components *should* represent. The fallacy in this approach is manifest: the costs of development are set by the market and thus may be more or less than an average, median, or ideal percentage of the selling price. Whether the land could be used as is without subdividing, development, and the attendant costs of land improvement is a separate question not adequately developed on the record, but it does not appear that that is the basis of the Court's disposition.

*Patterson & Patterson, Whitfield, Manikoff, Ternan & White* (by *Lawrence R. Ternan)* for defendant.

*Joseph S. Radom, P.C.* (by *Thomas B. Radom),* for plaintiff Eddy.

*Ginn, Kramer & Jacobson, P.C.* (by *James M. Ginn),* for plaintiff Sherman.

PER CURIAM. The plaintiffs are owners of property in Avon Township, Oakland County, that is zoned single-family residential. They claimed that this zoning was unreasonable, but the trial judge concluded that they had failed in their burden of showing unreasonableness. The Court of Appeals reversed:

"[W]e have a definite and firm conviction that the plaintiffs have met their burden and affirmatively proved that as to their respective parcels the ordinance is arbitrary and unreasonable and that no governmental interest is advanced by the present zoning classification which is, on the contrary, confiscatory. *Ed Zaagman, Inc v City of Kentwood* (consolidated with *Turkish v City of Warren),* 406 Mich 137 [277 NW2d 475] (1979); *Tuttle v Dep't of State Highways,* 397 Mich 44 [243 NW2d 244] (1976)."

We disagree with the Court of Appeals and reinstate the circuit court judgment.

I

The plaintiffs' parcels are adjoining ones that front on Rochester Road, a five-lane highway, between Avon and Hamlin Roads. One parcel was about 6 acres, with 337 feet of frontage and a depth of 768 feet; two homes (both rented) and a barn were on the property. The other parcel was 4.5 acres, with 250 feet of frontage and a depth of 787 feet; it was unimproved, one former residential dwelling on it having been burned and the other razed after repeated vandalism.

Rochester Road runs generally in a north-south direction. Immediately to the north of the parcels was a proposed 60-foot-wide road (Smitha Drive) leading to a residential subdivision which had received final preliminary plan approval. The next two properties to the north on Rochester Road were occupied by adjoining automobile dealers. Each parcel was about 750 feet in depth, but the rear portions were occupied only by storm water retention ponds.

Immediately to the south was an 82-foot-wide Detroit Edison right-of-way with three high-tension wires leading to a substation. Next to that was a vacant parcel owned by one of the plaintiffs. Across Rochester Road was a large vacant parcel on which residential uses were planned. North of that parcel, across from the automobile dealers, were fast-food restaurants in front of the Winchester Mall. Both the intersection of Rochester Road and Avon Road and that of Rochester Road and Hamlin Road were devoted to commercial purposes. Between the mall and Hamlin Road, vacant land had been platted for the single-family residential Avon Hills subdivision. This subdivision

included proposed residences with backlots on Rochester Road.

Experts provided the trial judge with varying opinions. Howard Keating, a land developer, testified that the plaintiffs' parcels could not be developed for single-family residences. He cited the proximity to heavily traveled Rochester Road as one reason. More significant to him, however, was that development costs would be higher since some noise protection device would be needed to nullify traffic noise.

Walter Mason, a real estate broker and appraiser, testified that the 250' × 750' parcel which housed the automobile dealership north of proposed Smitha Drive had been sold for $220,000. Mason believed that the heavy traffic, high-tension wires, and the nearby commercial development would adversely affect single-family residential development on the parcels. Mason acknowledged, however, that the same high-tension wires continued across Rochester Road and ran through a new subdivision to the west.

Max Maxim, another real estate broker, testified that the land value of the parcels as presently zoned would be $40,000 to $50,000 each. He did not believe the property was feasible for residential development because of the noise, traffic, high-tension wires, and nearby commercial uses. If the properties were rezoned to allow commercial uses, he thought that the larger would bring approximately $300,000, and the smaller $217,000.

Brandon Rogers, a community planner, said that a "natural" boundary between the commercial and the residential zones on the east side of Rochester

Road should have been drawn to the south of both parcels, beyond the electric wires. Rogers termed single-family residential zoning of these parcels "spot zoning"; it would be inconsistent with good planning principles to squeeze a small subdivision onto a six- or ten-acre parcel near a regional mall. Rogers opined that if the current zoning classification were sustained the property would most likely remain dormant, unsightly, and overgrown.

James Fuller, a real estate appraiser and broker, thought that the parcels could feasibly and profitably be developed for single-family housing. A road could be constructed between the two parcels and each split into four. The land value of one would then be $29,260, and the other $26,750. Alternatively, if the parcels were developed separately, one could be platted and subdivided into 16 lots and the other split four ways. Finally, he proposed a third alternative of platting the two properties together into a 26-lot subdivision.

He said that there was a market for single-family residential development alongside an arterial highway. The houses would merely sell for less than identical houses situated in quieter surroundings. Fuller stated that he had considered the adverse factors cited by other witnesses, but that they could be met by placing the houses a substantial distance away from Rochester Road and the northerly adjoining properties.

Steve Lehoczky, a community planner, had been involved in the preparation of the master plan for Avon Township, and he described this township as the fastest growing community in the six-county Detroit metropolitan area. He stated that in planning the township's future development an at-

tempt had been made to avoid strip commercial development and to cluster commercial development at major intersections. On Rochester Road between Avon and Hamlin Roads, Lehoczky said, these goals were served by drawing the residential-commercial line north of the subject property. The township had adequate acreage elsewhere planned for commercial development (416 acres in total), and in Lehoczky's opinion, extending the line south of the parcels would defeat the township's goals and invite further rezoning petitions.

From a community planning standpoint, he thought it would be reasonable to develop the subject parcels either separately or together for residential use. The township had asked for walls and fences to be built around the automobile dealership next to Smitha Drive and for the dealership's lights to be shielded from any nearby residential development. Some people were said to enjoy the open space provided by easements like the Detroit Edison one. Lehoczky said that Mr. Fuller's proposed layout maintained proper community planning concepts and represented reasonable development alternatives for the land.

Kermith Billette, another community planner, agreed that the parcels in question were suitable for single-family residential development. He gave numerous examples of single-family developments near high-tension wires and on major thoroughfares, including some low-acreage parcels. Mr. Billette believed that it would be feasible to split these parcels into four lots each, that the present zoning line was reasonable, that a high-tension wire easement could be beneficial in terms of providing a permanent open area for the residents,

and that strip commercial development was a
phenomenon to be feared.

## II

The trial judge, who viewed the parcels at the
parties' request, found that the property could be
reasonably adapted for single-family residential
use. He responded to each of the detrimental
factors identified for him. The traffic and noise of
Rochester Road would be minimized because the
"parcels are deep and the property is heavily
wooded, with a gentle roll resulting in a 20-foot
drop". He relied on Mr. Billette's testimony to
neutralize the effect of the Detroit Edison ease-
ment and noted that homes had been built adjoin-
ing the easement across Rochester Road. Smitha
Drive would provide an appropriate buffer between
the parcels and the automobile dealers; other com-
mercial development was separated by a substan-
tial distance. He relied on evidence supplied by
Mr. Fuller as well as Mr. Billette and said he was
"inclined to give little weight to [Mr. Keating's]
testimony":

"At first blush, this case appeared to be one which
favored the plaintiffs. However, upon examining the
testimony presented by the plaintiffs at trial, this court
found the plaintiffs' witnesses could not withstand
cross-examination nor did they meet their burden un-
der *Kropf [v Sterling Heights,* 391 Mich 139; 215 NW2d
179 (1974)] of demonstrating that the township zoning
was unreasonable.

"Rather, it is the conclusion of this court that the
zoning of plaintiffs' property as single-family residential
is reasonable. Moreover, even with Rochester Road and
its associated traffic, the Detroit Edison easement and
the car dealerships, this court finds the parcels are
large, heavily wooded and have enough depth off Roch-

ester Road to make single-family residences a reasonable use. Furthermore, this court finds based on the testimony that the subject parcels, as zoned, have reasonable economic value. Contrary to the plaintiffs' contention the difference in value in one zoning classification as compared with another classification does not alone make the zoning unreasonable. See *Ettinger v Avon Twp*, 64 Mich App 529, 533 [236 NW2d 129] (1975).

"It is the opinion of this court that both plaintiffs have failed to prove the present zoning classification unreasonable under the standard affirmed in *Kirk v Tyrone Twp*, 398 Mich 429, 439 [247 NW2d 848] (1976)."

## III

In *Christine Building Co v City of Troy*, 367 Mich 508, 518; 116 NW2d 816 (1962), we said:

"This Court, however, is inclined to give considerable weight to the findings of the trial judge in equity cases. This is primarily because the trial judge is in a better position to test the credibility of the witnesses by observing them in court and hearing them testify than is an appellate court which has no such opportunity. We do not ordinarily disturb the findings of the trial judge in an equity case unless, after an examination of the entire record, we reach the conclusion we would have arrived at a different result had we been in the position of the trial judge."

The Court of Appeals arrived at that different result in this case:

"Specifically, we find that the court erred in understating the detrimental effects of Rochester Road traffic on single-family residential development, where the unrebutted evidence showed a five-lane (widened from two since 1974) heavily traveled commercial artery connecting the City of Rochester with the City of Troy

and Avon Township. We also believe the court's characterization of the subject property as 'deep and heavily wooded, with a gentle roll resulting in a 20′ drop' is incorrect. The property is not deep. It is no deeper than the neighboring and abutting to the north commercial development. Both parcels are relatively small, being six and four acres respectively, and the roll would have a detrimental effect on any proposed residential use.

"The trial court concluded that the Winchester Mall located across the street, car dealerships located to the north and the 83′ Detroit Edison easement located to the south, were neutral if not beneficial factors. We conclude exactly the opposite. A small single-family residential development, located next to an existing automobile dealership with a retention pond at its eastern extremity, presents an uncongenial fusion of jarring disparity.

"The court relied heavily upon the testimony of James Fuller, an appraiser, who testified in favor of the defendant. We have reviewed that testimony and the testimony of Mr. Keating, a land developer who appeared as a witness on behalf of the plaintiffs, and we find Mr. Keating's testimony the more convincing. He thought single residential development not practically feasible.

"The court found that the testimony at trial supported the township's theory, by indicating that strip development tends to become unsightly due to the proliferation of signs and business facilities and thus adversely affects property values. The court concluded from that testimony that the proposed rezoning would result in strip development contrary to the governmental interest of the township: '[F]or one rezoning often sets precedent for more rezonings.' This ignores the fact of the rezoned areas located in close proximity to the plaintiffs' holdings and that the signed commercial area up and down Rochester Road dwarfs whatever minuscule governmental interest there might be in prohibiting additional signs on these two relatively small parcels."

In coming to a different result, the Court of

Appeals did not give the trial judge's findings the weight which they are due, *Christine Building.* "Heavily wooded" is a relative term, for example, one on which we are willing to defer to the trial judge who actually viewed the parcels. Even though the "parcels are relatively small", Mr. Billette testified that they were "ample to split with reference to [their] size, dimensions, the depth of any lots, the amount of trees on the property" and that it was not uncommon to find small parcels like these. Mr. Fuller also thought the two parcels could be developed for single-family dwellings. While Mr. Keating was of a different view, the trial judge chose not to give as much credence to his testimony because his experience was with large subdivisions which averaged 400 lots. Given the closeness of this case with diametrically opposed expert testimony, the admonition of *Christine Building* becomes determinative in the township's favor. Our review of the record, having in mind the trial judge's resolution of witnesses' credibility, does not lead us to the conclusion that we would have arrived at a different result if we had been in his position. *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976).

In lieu of granting leave to appeal, pursuant to GCR 1963, 853.2(4), we reverse the judgment of the Court of Appeals and reinstate that of the circuit court.

Costs to the defendant.

FITZGERALD, C.J., and WILLIAMS, COLEMAN, and RYAN, JJ., concurred.

LEVIN, J. We cannot join in the opinion of the Court because it is apparent, upon reading Mr. Fuller's testimony, that he was not testifying as an expert from his own knowledge or experience but

rather on the basis of information which he obtained by communicating with others and by reference to books and other secondary sources. Mr. Fuller simply repeated what he learned from those sources.

While Mr. Keating's experience was in the development of large subdivisions, Mr. Fuller had no experience as a developer at all. He was a broker and real estate appraiser, but the issue was not land value.

Mr. Keating's testimony was specific and detailed regarding the cost of subdividing and developing the land. It was his opinion that no prudent land developer would invest approximately $375,-000 in the hope of realizing a profit of about $30,000.[1] Mr. Fuller's testimony, in contrast, was not supported by specifics. He rather stated the percentages of the selling price which the various components *should* represent.

The fallacy of Mr. Fuller's approach is manifest. The cost of installing the requisite utilities and roads and the other development costs are set by the market and thus may be more or less than an average, median, or ideal percentage of the selling price. The per-foot cost of installing utilities and roads and other costs of development will not vary substantially between one location in the same general area and another, but obviously the percentage of the selling price that those costs represent will vary substantially, depending upon the selling price.

The selling price for a lot in a marketable location can be a number of times the selling price at a less desirable location, yet the cost of subdividing, of installing utilities and roads, is essentially the same. Mr. Fuller's use of percentages

---

[1] Mr. Keating included as a cost a land value of about $64,000 as is.

rather than of actual costs underscores his lack of actual experience in development, his dependence on information supplied by others and his lack of expertise, and his opinion whether a prudent land developer could be found to subdivide and develop this property is not worthy of adoption.

It is not a question of credibility. Mr. Fuller and Mr. Keating are no doubt both honest men. Mr. Keating alone had experience as a land developer.

It is a separate question whether the land could be used as is without subdividing, development, and the attendant cost of land improvements. The record in that regard is not adequately developed, but it does not appear from the per curiam opinion that that is the basis of this Court's disposition.

We would deny leave to appeal.

KAVANAGH, J., concurred with LEVIN, J.

RILEY, J., took no part in the decision of this case.